UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JUDGE

| | |
|---|---|
| TANGHENAM ELECTRIC WIRE & CABLE CO., LTD., <br>     Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br>     Defendant, <br><br> and <br><br> ENCORE WIRE CORP., <br><br>     Defendant-Intervenor. | Court No. 25-00049 <br><br> **PUBLIC VERSION** <br><br> Confidential Information Deleted From Page 3 |

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF
RULE 56. 2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Alexander H. Schaefer
Weronika Bukowski
Pierce Lee

Crowell & Moring LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 624-2773
aschaefer@crowell.com

*Counsel for Plaintiff*

Dated: November 11, 2025

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii
I.     INTRODUCTION .................................................................................................. 1
II.    SUMMARY OF ARGUMENT ............................................................................... 1
III.   ARGUMENT ........................................................................................................... 2
       A.   Tanghenam Demonstrated Its Ability to Trace Input Origins to Specific Exported Goods ........................................................................ 2
       B.   Commerce Exceeded Its Legal Authority by Imposing a Blanket Origin Finding ............................................................................................ 5
       C.   Commerce's Application of AFA to Input Origins Was Unlawful Because No Record Gap Exists ................................................................. 6
IV.    CONCLUSION ....................................................................................................... 9

PUBLIC VERSION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Hyundai Steel Company v. United States*,
  Slip Op. 17-173 (Ct. Int'l Trade 2017) ..................................................................................7

*Siemens Energy, Inc. v. United States*,
  806 F.3d 1367 (Fed. Cir. 2015)..............................................................................................4

**Statutes**

19 U.S.C. § 1304..............................................................................................................................5

**Regulations**

19 C.F.R. Part 134...........................................................................................................................5

19 C.F.R. § 351.104(a)(2)................................................................................................................8

**I.    INTRODUCTION**

Tanghenam Electric Wire & Cable Co., Ltd. ("Tanghenam") respectfully submits this reply brief in support of its motion for judgment on the agency record seeking reversal and remand of the Department of Commerce's final circumvention determination on aluminum wire and cable from China with respect to Vietnam.[1] Commerce's decision to preclude Tanghenam from the certification program, and its application of adverse facts available ("AFA") with respect to input origins, are both unsupported by substantial evidence, contrary to law, and represent a misapprehension of the factual record developed during this inquiry.

**II.    SUMMARY OF ARGUMENT**

Commerce's decision to bar Tanghenam from the certification program rests on an unsupported finding regarding Tanghenam's ability to identify its input origins. Contrary to Commerce's assertion, Tanghenam provided a comprehensive demonstration of its ability to trace the origins of inputs to specific export shipments, as documented during verification. The record substantiates that Tanghenam matched production and warehouse movement records to individual sales, enabling the identification of input origins on a shipment-by-shipment basis.

By precluding Tanghenam from the certification program, Commerce exceeded its statutory authority by imposing a blanket country-of-origin designation, compelling Tanghenam to declare all exports as Chinese-origin irrespective of documented Vietnamese-origin merchandise. This oversteps the authority reserved for U.S. Customs and Border Protection ("CBP") to make origin determinations and in so doing disregards shipment-specific evidence.

---

[1] *Aluminum Wire and Cable From the People's Republic of China: Final Negative Scope Ruling and Final Affirmative Determination of Circumvention With Respect to the Socialist Republic of Vietnam*, 90 Fed. Reg. 8,196 (Jan. 27, 2025) ("Final Determination"), and associated decision and analysis memoranda.

Finally, Commerce unlawfully applied AFA regarding the origin of inputs for valuation analyses. The Defendant's argument that an informational gap exists in the record is without merit, because the alleged gap was closed by information collected during verification. Commerce routinely accepts verified documentation as accurate and complete. Here, the record includes all necessary factual information—specifically, the correct country of origin of all inputs—rendering Commerce's application of AFA unsupported by substantial evidence.

### III.    ARGUMENT

#### A.    Tanghenam Demonstrated Its Ability to Trace Input Origins to Specific Exported Goods

Defendant and Defendant-Intervenor both assert that two distinct tracing issues exist in circumvention inquiries: (1) tracing country of origin of inputs for valuation analyses; and (2) identifying the origin of inputs in specific exported merchandise. *See* Def. Br. at 21; Def. Int. Br. at 16. Defendants argue that while Tanghenam showed it could trace input origins for valuation purposes, it lacked a system to tie specific inputs to specific export lots once those products enter finished goods inventory, thus justifying ineligibility for certification. *See id.* This assertion is not supported by substantial evidence and in fact the record contradicts it.

During the verification, Commerce requested that Tanghenam demonstrate its ability to trace the inputs for its two largest export shipments of AWC to the United States for 2022 and 2023. *See* Verification Report (Nov. 20, 2024) (C.R. 381) (P.R. 188), at 23. Tanghenam performed the requested tracing successfully. The administrative record, specifically Verification Exhibit FVE-8, contains a comprehensive trail demonstrating the step-by-step process by which Tanghenam connects exported products to the origin of their underlying inputs:

1. **Identification of Export Shipments**: Tanghenam began by pinpointing, in its sales ledger, the two largest shipments of AWC exported to the United States during the

2

period. For illustration, the first line item among these was a shipment of [          ] of

[                                    ], sold to [                         ] on

[                    ]. The product code for this merchandise is [                ]. *See*

Verification Exhibits – Part 12 (C.R. 374), at 117-118.

2. **Mapping Exports to Individual Batches**: Tanghenam then examined its inventory movement ledger for product [               ] and identified ten discrete batches of AWC received at its warehouse between [                              ]. The batches collectively totaled the same quantity as the export shipment. *See* Verification Exhibits – Part 12 (C.R. 374), at 119.

3. **Tracing Batch Numbers**: Each batch is associated with a document number that links directly to the underlying purchase of inputs. The document number serves as the key to trace not only the production of the finished good, but also the input materials used in that production. *See* Verification Exhibits – Part 12 (C.R. 374), at 119-122.

4. **Linking Inventory Movement to Input Purchases**: Tanghenam then utilized its inventory movement ledger and purchase ledger to identify related input purchases. *See* Verification Report at 24 ("Company officials can link the inventory movement report to their raw materials purchase ledger using the 'document number.'"); *see also* Verification Exhibits – Part 13 (C.R. 375), at 1–12.

5. **Identification of Input Origins**: Tanghenam's purchase ledger is exhaustive; it specifies both the address of the supplier and, crucially, the true country of origin of the input. Commerce's verification team confirmed that the ledger indicates both these data points. *See* Verification Exhibits – Part 13 (Oct. 9. 2024) (C.R. 375), at 5-12.

This process was transparent, complete, and specifically tailored to the individual export lots at issue. The documents on the record, including the inventory movement record and purchase ledger, demonstrate Tanghenam's ability to reconstruct the full supply chain for any particular exported item, including the country of origin for each input incorporated into a given shipment.

Defendant contends that Commerce's determination of Tanghenam's ineligibility for the certification process is based solely on the finding that Tanghenam cannot trace specific inputs to specific exports. *See* Def. Br. 23–24. According to Defendant, this conclusion is supported by record evidence and is not the result of an AFA finding. *Id.* However, Commerce's decision relies entirely on a single statement in the verification report, which is unsupported by substantial evidence.

In the Final Determination, Commerce found that Tanghenam does not have a system to tie specific inputs to specific exports. *See* Final IDM (Jan. 17, 2025) (P.R. 202), at 14. But this finding was based entirely on a single statement in the verification report—namely, that "{o}nce in finished goods inventory, there is no way to track which products go to sales." *Id.*, quoting Verification Report (C.R. 381), at 24. The record evidence discussed above proves this wrong. Tanghenam was able to manually and accurately match production and warehouse movement records to specific U.S. sales. *See* Verification Exhibits – Part 12 (C.R. 374), at 117-122; Verification Exhibits – Part 13 (C.R. 375), at 1-12.

Support by substantial evidence must be determined on the entirety of the record, considering the evidence that detracts from the agency's conclusion. *See Siemens Energy, Inc. v. United States*, 806 F.3d 1367, 1369 (Fed. Cir. 2015) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)). Here, the evidence in the record demonstrates that Commerce's

4

conclusion regarding Tanghenam's eligibility for the certification program is unsupported by substantial evidence.

### B. Commerce Exceeded Its Legal Authority by Imposing a Blanket Origin Finding

By barring Tanghenam from the certification program, Commerce forces Tanghenam to report all its AWC exports from Vietnam as Chinese-origin, even when Tanghenam can specifically and demonstrably prove the absence of Chinese-source inputs shipment-by-shipment. In other words, Commerce requires Tanghenam to lie about the origin of its products – that requirement exceeds Commerce's legal authority.

The statute tasks CBP with determining and verifying the country of origin at entry. *See* 19 U.S.C. § 1304; 19 C.F.R. Part 134. Commerce's certification program is intended as additional assurance, not a substitute for origin determination. CBP—via entry documentation and post-entry review—maintains full authority to require supporting evidence, verify claims, and reject submissions as necessary. Commerce cannot preempt this authority by dictating that every entry for a barred respondent must be declared Chinese-origin, irrespective of actual content, documentation, or verification.

Defendant's response ignores the evident illegality of this practice and simply reiterates Commerce's factual conclusions. *See* Def. Br. at 24-25 ("It is precisely the ability to determine the country of origin and mark the goods that Commerce has found Tanghenam is unable to do."). However, Plaintiff's contention concerns not only the factual finding, but also whether Commerce possesses the legal authority to impose a blanket ban on certification. The law is clear—CBP is responsible for customs enforcement, including origin verification for duty assessment. While Commerce may set conditions for certification, it cannot supplant CBP's function or override shipment-specific evidence.

5

Commerce's authority in anti-circumvention applies only to merchandise actually incorporating inputs from the order-country (here, China). Where Tanghenam can demonstrate and document Vietnamese-origin merchandise, Commerce has no authority to require the opposite origin to be declared for all its exports. By imposing a blanket ban on certification, Commerce unlawfully compelled Tanghenam to declare the origin of its products based on legal fiction rather than verifiable facts. In doing so, Commerce overstepped its statutory and regulatory authority and encroached upon CBP's responsibilities.

As demonstrated above, Tanghenam is able to trace specific inputs to specific exports on a shipment-by-shipment basis. Commerce's finding that Tanghenam lacks a system to tie specific inputs to specific exports is not only unsupported by substantial evidence, but also not dispositive of whether Tanghenam can accurately declare the correct country of origin for an individual shipment. While Commerce may identify activities that constitute circumvention, CBP maintains the legal authority to determine whether each shipment was manufactured through such circumventing activities. Therefore, Commerce's blanket ban on certification is unlawful.

### C. Commerce's Application of AFA to Input Origins Was Unlawful Because No Record Gap Exists

Defendant concedes that Commerce collected information from Tanghenam during verification identifying the correct country of origin for all inputs used during the period of inquiry. *See* Def. Br. at 15; *see also* Final IDM (P.R. 202), at 5 n.23. Nonetheless, Defendant asserts that Commerce was justified in applying AFA because it has discretion to reject new information provided during verification. *See* Def. Br. at 11. However, in this case, Commerce actually exercised its discretion to accept the information obtained at verification.

Defendant incorrectly asserts that no factual information may be added to the administrative record after the questionnaire phase. *See* Def. Br. at 15 ("...verification comes after the record closes..."). This position misstates Commerce's standard practice. Commerce routinely accepts minor corrections and additional factual information at verification to ensure the accuracy and completeness of the record. Indeed, Commerce's own verification agenda explicitly states that new information may be accepted under certain circumstances. See Verification Agenda (Sept. 21, 2024) (P.R. 178), at 2.[2] Moreover, "Commerce … possesses considerable latitude in the formation and application of its verification procedures, and is authorized to request the submission of factual information 'at any time during a proceeding.'" *Hyundai Steel Company v. United States*, Slip Op. 17-173, at 22 (Ct. Int'l Trade Dec. 27, 2017) (citing 19 C.F.R. § 351.301(a) and *Micron*, 117 F.3d at 1396).

Here, Commerce reasonably exercised its discretion to request and accept new factual information during verification. At the beginning of the verification, Tanghenam presented and corrected errors about supplier addresses and input origins. *See* Verification Report, at 4-5. Commerce reviewed and accepted these corrections at the outset. *Id.* Upon later discovering additional similar errors, Commerce chose not merely to collect samples showing the discrepancies, but to collect Tanghenam's entire purchase ledger reflecting the correct country of origin for all inputs used during the period of inquiry. *Id.* at 21-22; *see also* Verification Exhibits – Part 13 (C.R. 375), at 5-12.

Commerce is not required to accept every document presented during verification, but once information is received, reviewed, and relied upon, it becomes part of the record. The

---

[2] "New information will be accepted at verification only when: (1) the need for that information was not evident previously; (2) the information makes minor corrections to information already on the record; or (3) the information corroborates, supports, or clarifies information already on the record."

purchase ledger collected during verification is part of the administrative record, just like any other documents. Commerce's acceptance of the purchase ledger therefore closed any alleged informational gap regarding the correct country of origin for the inputs.

Defendant incorrectly asserts that Commerce "rejected" this information later by applying AFA. However, the record in this case does not consist of separately "accepted" and "rejected" documents. Under 19 C.F.R. § 351.104(a)(2)(i), the official record will include a copy of a rejected document only if the document was rejected for one of the enumerated reasons.[3] None of those reasons apply here. Thus, Commerce has accepted all of the documents in the official record of this case—including the purchase ledger.

In its Final Determination, Commerce did not "reject" the correct country of origin information. Instead, it simply chose not to use the information. Indeed, Commerce incorrectly stated that the information "is not on the record." *See* Final IDM, at 5. This conclusion is unsupported by substantial evidence, as the correct country of origin information is clearly found in Verification Exhibit FVE-8. *See* Verification Exhibits – Part 13 (C.R. 375), at 5-12. Contrary to Commerce's claims, this information was neither withheld nor unverifiable. Tanghenam proactively disclosed errors in its initial country of origin reporting and provided the corrected data, which Commerce verified in detail. *See* Verification Report, at 4, 5, 21, and 22. Tanghenam's actions did not constitute a failure to provide information by the deadline or as impeding the proceeding; to the contrary, they demonstrate full cooperation and maximal effort to ensure accuracy and completeness.

---

[3] The official record will include a copy of a rejected document, solely for purposes of establishing and documenting the basis for rejecting the document, if the document was rejected because: (A) The document, although otherwise timely, contains untimely filed new factual information (see § 351.301(c)); (B) The submitter made a nonconforming request for business proprietary treatment of factual information (see § 351.304); (C) The Secretary denied a request for business proprietary treatment of factual information (see § 351.304); and (D) The submitter is unwilling to permit the disclosure of business proprietary information under APO (see § 351.304). See 19 C.F.R. § 351.104(a)(2)(ii).

Defendant cites a passing remark in the verification agenda, stating that acceptance of information at verification "does not guarantee that {it} will be able to use it for {the} final determination." Def. Br. at 7, citing Verification Agenda (P.R. 178), at 2. This statement alone does not confer complete authority for Commerce to disregard verified information on the record. In fact, the statement even infers that Commerce will use new factual information collected at verification if it is able to do so. Here, the record demonstrates that Commerce was able to use the correct country-of-origin information. The information was thoroughly verified during the verification and could easily be used to update the valuation analyses. However, Commerce chose to overlook the record by treating the situation as a fictional information gap.

Defendant claims that a gap remains because the country-of-origin data is not found in the factors of production ("FOP") file submitted by Tanghenam during the questionnaire phase. *See* Def. Br. at 17. However, Defendant's argument that this information must appear in a specific document is meritless, as the same could be said of any information collected after the questionnaire phase. As the verification agenda indicates, Commerce updates relevant documents with information collected at verification if it is able to do so. *See* Verification Agenda (P.R. 178), at 2. Thus, the relevant question is not where in the record the information appears, but whether the necessary factual information is available in the record. Here, it indisputably is. Accordingly, Commerce's application of AFA was unsupported by substantial evidence.

**IV.   CONCLUSION**

For the foregoing reasons, Commerce's determination regarding Tanghenam's certification ineligibility and its application of AFA to input origins should be reversed. The record demonstrates Tanghenam's ability to trace the origins of inputs to specific export shipments. Commerce's blanket country-of-origin designation exceeds its statutory authority and

9

improperly overrides the responsibilities of CBP. The administrative record, as supplemented during verification, contains all necessary factual information, eliminating any basis for the application of AFA. Accordingly, the Court should find Commerce's determination unsupported by substantial evidence and contrary to law.

    Respectfully submitted,

    /s/ Pierce Lee
    Alexander H. Schaefer
    Weronika Bukowski
    Pierce J. Lee

    Crowell & Moring LLP
    1001 Pennsylvania Ave NW
    Washington, DC 20004
    (202) 624-2773
    aschaefer@crowell.com

    *Counsel for Plaintiff*

Dated: November 11, 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the Rules of this Court, the Court's Standard Chamber Procedures, and the Court's scheduling order (ECF No. 23) in that it contains 2,848 words, including text, footnotes, and headings.

/s/ Pierce J. Lee
Pierce J. Lee

Dated: November 11, 2025

PUBLIC VERSION

## CERTIFICATION OF SERVICE

This is to certify that on November 11, 2025, in accordance with Administrative Order 25-01, I have caused a copy of the foregoing document to be served upon the following parties via secure electronic transmission in accordance with Rule 5(b)(2)(E) of the Rules of the Court of International Trade:

Blake W. Cowman
Lead Counsel for Defendant United States
U.S. Department of Justice
Commercial Litigation Branch – Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
blake.w.cowman@usdoj.gov

Daniel J. Calhoun, Esq.
Lead Counsel for Defendant-Intervenor Encore Wire Corp.
Rock Creek Trade LLP
900 19th Street NW, Suite 600
Washington, DC 20006
(202)297-8860
dcalhoun@rockcreektrade.com

/s/ Pierce J. Lee
Pierce J. Lee

Dated: November 11, 2025